IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA

CASE NO.:

CHARITY PEARROW, as
Personal Representative of the
Estate of MARINA RALPH,
a deceased minor,

     Plaintiff,

v.

ESA P PORTFOLIO L.L.C., a foreign
limited liability company d/b/a
EXTENDED STAY AMERICA PREMIER SUITES;
ESA P PORTFOLIO OPERATING LESSEE LLC.,
a foreign limited liability company d/b/a
EXTENDED STAY AMERICA PREMIER SUITES,

     Defendants.

_____/

## COMPLAINT

Plaintiff, CHARITY PEARROW, as Personal Representative of the Estate of MARINA

RALPH, a deceased minor, by and through her undersigned counsel, sues Defendant ESA P.

PORTFOLIO LLC d/b/a EXTENDED STAY AMERICA PREMIER SUITES (hereafter

"ESA") and alleges as follows:

## INTRODUCTION

On October 4, 2019, the body of sixteen-year-old Marina Ralph was found, naked from

the waist down, alone in room 334 of the Extended Stay America Premier Suites at 1401 West

McNab Road, Pompano Beach, Florida. Marina's body had been moved after her death and was

staged, on the floor, against the foot of the bed. Marina was the unfortunate victim of a human

sex trafficking venture which was operating out of the hotel, using a stolen identification and

credit card, and supplying drugs to minors to facilitate their commercial sexual exploitation.

JUSTICE FOR KIDS
**A Division of Kelley Kronenberg**

10360 W. State Road 84 | Fort Lauderdale | Florida | 33324 | Tel. (754) 888-KIDS (5437) | Fax (954) 644-4848 | Toll Free 844-4KIDLAW
justiceforkids.com

*** FILED: BROWARD COUNTY, FL  BRENDA D. FORMAN, CLERK 10/01/2021 12:35:48 AM.****

Exhibit 1

Whether the lethal cocktail of narcotics found in Marina's system was accidental or intentional, it was preventable had Extended Stay reasonably secured its property and provided reasonably safe premises. It did neither. This Complaint details the Defendant's acts and omissions which directly and proximately caused Marina's death and all the harms that she, her Estate and her statutory survivors have been forced to, and will continue to, suffer.

### JURISDICTION

1. This action is for damages in excess of thirty thousand dollars ($30,000.00) excluding interest, costs, and attorney's fees, and is therefore within the exclusive jurisdictional limits of this Court under Florida Statute § 26.012.

2. This action is brought pursuant to Florida's Wrongful Death Act, *Fla. Stat. 768.16-768.26*, and all other applicable statutes and laws of the State of Florida.

3. This Court has jurisdiction over the Defendant pursuant to § 48.193 as the Defendant:

   a. was operating, conducting, engaging in, or carrying on a business or business venture in the state of Florida and/or had an office or agency in this state;

   b. committed tortious acts within the state of Florida, as set forth throughout the Complaint;

   c. is, and was, engaged in substantial and not isolated activity within this state;

   d. has maintained continuous and systematic general business contact with the state of Florida; and

   e. has submitted itself to the jurisdiction of the court and has demonstrated minimum contacts with the state of Florida, by purposefully availing itself of the privilege of conducting activities within the state, thus invoking the benefits and protections of its laws. By way of example, the Defendant has previously initiated suit in Broward County, on multiple occasions, to enforce contractual obligations of the room rental agreements entered into with residents at the Extended Stay America Premier Suites located at 1401 W. McNab Road, Pompano Beach, Florida.

4.      The Defendant's conduct and connection with the state of Florida are such that it should reasonably anticipate being brought into court in the state of Florida and, as such, has clear notice that it is subject to suit here.

## VENUE

5.      The acts and omissions of the Defendant, the injuries to and death of the child, and all causes of action have occurred and/or accrued in the city of Pompano Beach, Broward County, Florida.

6.      All of the conduct giving rise to this Complaint occurred in Broward County, Florida and venue properly lies before this Court.

## PARTIES

7.      Marina Ralph ("Marina") died on or about October 4, 2019, in Broward County, Florida.

8.      At the time of her death, Marina was only sixteen (16) years old.

9.      Marina Ralph is survived by her biological parents:

a.      Charity Pearrow, her natural mother; and

b.      Daniel Ralph, her natural father.

10.     Marina was not married at the time of her death; she is not survived by a spouse; and she did not have, nor was she survived by, any children.

11.     CHARITY PEARROW, Marina's biological mother, is and was, at all material times, a resident of Broward County, Florida.

12.     After Marina's death, the ESTATE OF MARINA RALPH was properly opened under the laws of the State of Florida.

13.     CHARITY PEARROW is the duly appointed, qualified and acting Personal Representative of the ESTATE OF MARINA RALPH and is otherwise *sui juris*.

justice for kids

Exhibit 1

14.    As the Personal Representative of the ESTATE OF MARINA RALPH, the Plaintiff brings this action for the decedent's injuries and wrongful death in her representative capacity on behalf of Marina Ralph's statutory survivors and/or beneficiaries.

15.    At all material times, Defendant ESA P PORTFOLIO LLC ("ESA") was a foreign limited liability company with its principal address at 11525 N. Community House Road, Suite 100, Charlotte, North Carolina 28277.

16.    As referenced above, and as set forth more specifically below, Defendant ESA was, at all material times, operating, conducting, engaging in, or carrying on a business or business venture in the state of Florida, including by way of doing business as Extended Stay America Premier Suites located at 1401 McNab Road, Pompano Beach, Florida 33069.

17.    Defendant ESA owned the real property, and the rooms therein, located at 1401 W. McNab Road, Pompano Beach, Florida 33069, inclusive of rooms numbered 326 and 334.

18.    At all material times, Defendant ESA P PORTFOLIO OPERATING LESSEE LLC was a foreign limited liability company with its principal address at 11525 N. Community House Road, Suite 100, Charlotte, North Carolina 28277.

19.    As referenced above, and as set forth more specifically below, Defendant ESA P PORTFOLIO OPERATING LESSEE LLC was, at all material times, operating, conducting, engaging in, or carrying on a business or business venture in the state of Florida, including by way of doing business as Extended Stay America Premier Suites located at 1401 McNab Road, Pompano Beach, Florida 33069.

20.    Defendant ESA P PORTFOLIO OPERATING LESSEE LLC owned the real property, and the rooms therein, located at 1401 W. McNab Road, Pompano Beach, Florida 33069, inclusive of rooms numbered 326 and 334.

21.    Plaintiff has complied with any and all conditions precedent prior to the bringing of this action or any such conditions have been waived.

justice for kids

Exhibit 1

## GENERAL ALLEGATIONS

### MARINA RALPH

22.     Marina was born on August 1, 2003.

23.     She was the only child and daughter of Charity Pearrow and Daniel Ralph.

24.     Ms. Pearrow and Mr. Ralph were briefly married, before a lengthy separation followed by divorce.

25.     Though a statutory survivor, Mr. Ralph was not involved in Marina's upbringing.

26.     Charity, a single mother, raised Marina and has been her sole caretaker since birth.

27.     They moved around but eventually settled in south Florida.

28.     At 13 years old, Marina became pregnant.

29.     The pregnancy was terminated.

30.     Shortly after the termination, Marina was sexually assaulted.

31.     At the time, Marina was a student at Sunrise Middle School.

32.     Marina had a difficult time in the wake of the pregnancy, termination, and assault.

33.     Her mental health suffered, and she struggled.

34.     During her freshman year of high school, Marina met another girl ("Z") who was 18 years old and who began to insert herself into Marina's life and exert influence over Marina in adverse ways.

35.     Not long after meeting Z, Marina ran away from home.

36.     Marina was away from home for several days.

37.     The pattern repeated a few times.

38.     Charity was concerned but, despite the runaway periods, Marina continued to keep in contact with Charity.

justice for kids

Exhibit 1

39.    Their relationship was close, and Charity was trying to avoid shutting down communication.

40.    At one point, Charity confronted Z and told her to stay away from Marina.

41.    Z told Charity to "stay out of my business" and said, "I'll get her if I want her."

42.    Unbeknownst to Charity, Z had recruited Marina into the world of human sex trafficking and commercial sexual exploitation.

43.    When Marina would call, while on a runaway, or return home, she told Charity that she had stayed with a friend at a hotel in Pompano Beach.

44.    Marina told Charity there were other girls staying at the hotel, too.

45.    Marina expressed particular concern about one of the girls, who was only 15 years old.

46.    One day, in August 2019, Marina was home.  Marina said she wanted to stay with her friend at the hotel in Pompano Beach.  She wouldn't tell Charity the name of the hotel.  She wanted to take the bus and did not want Charity to drive her.  Marina was planning to walk to the bus station.  It was raining.  Charity did not want her wandering in the rain but also knew that Marina was not going to stay home.  Charity drove her to the bus station. Marina asked for money. Charity had $10 and gave it to her.  Marina took the bus.

47.    Charity and Marina maintained contact via phone, texting and/or calling.

48.    Marina told Charity that she was fearful of several men at the hotel but that she did not want to leave the other girls behind.

49.    Marina's traffickers were operating out of the Extended Stay Premier Suites at 1401 W. McNab Road, Pompano Beach, Florida and using stolen identification and credit cards to secure rooms.

50.    Her traffickers took photos of Marina, created an ad, and posted it to a site named List Crawler, and possibly others.

51.     The ad provided a phone number for men to call, advertising that Marina was "available now till early mornings. i [sic] wanna get naughty for you."

52.     The phone number identified in the ad was (754) ***-**** and was Marina's cell phone number.

53.     The ad further advertised that Marina was doing "incalls," a reference that johns would need to come to her room, rather than her go out to them.

54.     On August 21, 2019, Charity sent Marina a text and got a response.

55.     The texted response did not sound like something Marina would say.  Charity was concerned that Marina's phone was being controlled by someone else who was with Marina, but she was unable to reach Marina by phone.

56.     Unbeknownst to Charity, it was the same day the ad was posted to List Crawler.



*Phone Number and Image Redacted*

57.     On August 23, 2021, Marina called Charity from an unknown number and said that her phone had been taken from her at knifepoint.

58.     Charity told Marina she would call 911.   Marina begged Charity not to, crying that she was afraid they would harm her (Marina) or Charity, because they knew where Charity lived.

59.     Charity pleaded with Marina to come home.

60.     Several days later Marina returned home.

61.     Marina asked Charity to get her mace, for her safety, which Charity did.

62.     Charity had an old cell phone and had it connected for Marina, to the same phone number Marina's phone had been connected to.

63.     On August 29, 2019, Marina left again, but she continued to keep in touch with Charity.

64.     On September 12, 2019, Marina called Charity.

65.     Marina was crying.   She said she was at the same hotel in Pompano Beach.   She said "I just want out.  I can't handle it."

66.     Marina asked for help.

67.     Charity told her she would come pick her up immediately and take her to get help.

68.     Marina begged her not to come, saying it wasn't safe.

69.     Charity told her that if she came home, Charity promised she would take her to for help.

70.     Charity knew Marina's mental health was suffering but did not know it had to do with human trafficking.

71.     Marina returned home that evening and Charity immediately took Marina to Joe DiMaggio Children's Hospital ("Joe DiMaggio").

72.    Marina was admitted to Joe DiMaggio on September 12, 2019, pursuant to Chapter 394, Florida Statutes (commonly referred to as Florida's Mental Health Act or the Baker Act).

73.    Marina remained at Joe DiMaggio through September 18, 2019, at which point she was discharged.

74.    During the admission, Marina told treaters she was taking a variety of drugs, though the only substance found in her system was THC.

75.    She later told Charity that she was hoping to be admitted for a lengthier time, because she was fearful of the people she had been staying with at the hotel.

76.     Charity tried to persuade Marina to speak with the police.  Marina would not agree, saying she was too afraid of them.  Marina told Charity she just wanted "her life back" and asked if she could go to a new school.

77.    Charity registered Marina at Whiddon Rogers Educational Center in Fort Lauderdale.

78.    Marina began classes but, on September 28, 2019, she left again.

79.    Marina returned home either late September 30 or early October 1, 2019, as Charity saw her in their apartment around 1pm on October 1, 2019.

80.    By roughly 6:00pm, on October 1, 2019, Marina was gone.

81.    Charity tried calling her, to no avail.

82.    On October 2, at approximately 4:30pm, Marina texted Charity to say, "I meant to come home."

83.    Charity began calling, but no answer.

84.    Between 6:06pm – 6:10pm they exchanged texts.

85.    It was their last communication.

justice for kids

Exhibit 1

86.     On October 4, 2019, around 10:00am, the Broward Sheriff's Office received a 911 call, advising that someone was overdosing in a room at the Extended Stay America Premier Suites in Pompano Beach, Florida.

87.     Deputies from the Sheriff's Office responded to the hotel.

88.     Upon arriving, Marina was found, alone and dead, inside room 334.

89.     Her body was on the floor, supine, near the foot of the bed.

90.     She was naked from the waist down.

91.     She was only 16 years old.

92.     The Broward County Medical Examiner's Office was called and responded.

93.     There was a reddish dried substance near her genitals.

94.     Small red defects were found on the back of her neck.

95.     The door jamb to the bathroom, inside the room, was broken, as though the door had been kicked in.

96.     The Medical Examiner's Office found that Marina's rigor and livor mortise were inconsistent with her body's position, suggesting her body had been moved after her death.

97.     The Deputy Chief Medical Examiner, Dr. Stephen Robinson, determined that Marina's death was the result of the combined acute toxic effects of cocaine and fentanyl.

### ROOMS 326 AND 334

98.     During the evening of September 30, 2019, a black sports car pulled into the parking lot of the Extended Stay, drove past the lobby, made a u-turn and came back, stopping in front of the lobby doors.

99.     A white female ("UnSub 1") exited the passenger side and entered the lobby.

100.    She approached the front desk.

101.    An employee of the Extended Stay was standing at the desk.

102.    UnSub 1 rented two rooms (numbers 326 and 334).

justice for kids

Exhibit 1

103.   The rooms were rented for 5 days, each, and each room was rented for 1 person.

104.   UnSub 1 presented a credit card and driver's license bearing the name L****
C****. [1]

105.   Both the driver's license and credit card were stolen.

106.   UnSub 1 was not LC.

107.   UnSub 1 was not Marina Ralph.

108.   UnSub 1 was not Z.

109.   Marina Ralph was not present at or in the lobby at the time the rooms were
registered and paid for.

110.   Marina Ralph did not enter the Extended Stay America Premier Suites through the
lobby on September 30, 2019.

111.   Marina Ralph did not enter the Extended Stay America Premier Suites through the
lobby at any time in between the date and time rooms 326 and 334 were rented and the date and
time of her death.

112.   Marina Ralph, a minor child, was able to access and enter the hotel alone without
passing through the lobby.

113.   The Defendant did not stop or identify Marina, nor attempt to determine which
room she was visiting.

114.   Upon information and belief, between October 3 and the morning of October 4,
2019, a front desk clerk/manager observed and/or was made aware of suspicious activity
between rooms 326 and 334, including but not limited to the fact that there were two unknown
males – neither of whom were registered guests – going back and forth between the rooms at odd
hours.

115.   The Defendant did nothing to further investigate the suspicious activity.

---

[1] As the DL and credit card were stolen, the true owner's identity is being withheld from public filing; but will be
provided to counsel separately.

justice for kids

Exhibit 1

## HUMAN TRAFFICKING AND THE HOSPITALITY INDUSTRY

116.    The Florida Legislature has found that human trafficking is a form of modern-day slavery which victimizes young children, teenagers, and adults.

117.    Thousands of victims are trafficked annually across international borders worldwide and many of these victims are trafficked into this state.

118.    Frequently, victims of human trafficking are subjected to force, fraud, or coercion for the purpose of sexual exploitation or forced labor.   However, many times, minor victims are are lured into trafficking ventures, regardless of whether force or fraud is used.

119.    While some traffickers keep their victims under lock and key, the most frequently used practices are less obvious techniques that include isolating victims and creating distance or wedges between them and the public and family members; confiscating identification documents; and/or using or threatening to use violence toward victims or their families, among others.

120.    The role of the hospitality industry in either facilitating or preventing human trafficking has been widely established and known for years and was certainly well known to the Defendant prior to 2019.

121.    Hotel rooms have long been a preferred venue for the sale of minors because of apparent anonymity and the perception of minimized risk.

122.    Despite efforts by the United Nations, the White House, and non-governmental organizations to promote policies and procedures to prevent human trafficking, the majority of human trafficking incidents occurred in hotels, a fact widely known throughout the hospitality industry.

123.    For many years, and certainly as of the time-period involved in this case, the hospitality industry had been on notice of the prevalence of human trafficking for the entirety of

justice for kids

Exhibit 1

the twenty-first century but had done little to nothing to prevent the ongoing occurrences of human trafficking in hotels.

124.    The complicity of the hospitality industry is essential to the perpetuation of human trafficking, allowing traffickers to remain transient, collect profits, and evade detection. Sex trafficking ventures move from place to place so that they are less visible to law enforcement. Similarly, sex traffickers also want to keep their victims moving from place to place to isolate them from any possible means of escape or rescue. Traffickers are, and at material times were, well-aware of the seclusion and anonymity attendant with booking rooms with hotels/motels, where they know it is unlikely that they will be disturbed.

125.    Due to the hospitality industry's failure to embrace anti-trafficking policies and practices, children are trafficked for sex in hotels throughout the United States.

126.    Hotel and/or motel employees are uniquely situated to identify and report suspicious activity on hotel property. From check-in to check-out there are numerous indicators that traffickers and the adults and children who are victimized by sex trafficking exhibit during their stay at a hotel property. With proper training and other reasonable security measures, hotel owners and operators could prevent the trafficking of persons on their properties.

127.    A successful anti human trafficking protocol should start with a hotel's front desk staff.

128.    A hotel's front desk is first in line to spot warning signs of human trafficking.

129.    A successful anti human trafficking protocol also requires hotels to make information available throughout the facility for victims of human trafficking on how to seek help.

130.    The Department of Homeland Security ("DHS") has identified several warning signs that indicate the presence of human trafficking at hotels. According to DHS, housekeeping, room service, maintenance, concierge, bellman, front desk, food and beverage, security, and

justice for kids

Exhibit 1

valet staff at hotels all can and should be vigilant in observing indicia of human trafficking on the hotel premises including but not limited to: (a) persons who show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior; (b) persons who lack freedom of movement or are constantly monitored; (c) persons who have no control over or possession of money or ID; (d) persons who dress inappropriately for their age; (e) extended stay with few or no personal possessions in the room; (f) loitering and solicitation of male patrons; and (g) repeatedly waiting out front to be picked up by a male.

131.    Hotel staff who have undergone training are more aware of human trafficking and can at best prevent it from happening or at worst, are more willing to report it when it happens, than hotel staff who have not been trained.

132.    Hotels and hotel brands can and should adopt policies and procedures related to human trafficking and make anti human trafficking resources readily available to employees.

133.    Hotels and hotel brands can and should mandate that all staff working at all hotel properties complete anti human trafficking training.

134.    Hotels and hotel brands can and should encourage staff to report suspected incidents of human trafficking when observed on hotel properties.

135.    Hotels and hotel brands can and should develop and maintain relationships with law enforcement regarding appropriate and timely responses to suspected incidents of human trafficking on hotel properties.

136.    Hotels and hotel brands can and should post anti human trafficking awareness and informational materials in common areas and guest rooms to help eliminate human trafficking.

137.    Similarly, hotels and hotel brands can and should develop and maintain relationships with non-profit service providers in the field regarding appropriate human trafficking prevention training for hotel staff.

justice for kids

Exhibit 1

138.   In those instances, in which hotels engage the services of outside parties to provide security on their premises, hotels and hotel brands have an obligation to ensure that anyone providing security on the property is trained and educated regarding appropriate identification and prevention measures with respect to human trafficking and the commercial sexual exploitation of minors.

139.   Hotel brands that do not identify and report evidence of human trafficking on hotel properties do so in spite of the knowledge that preventative training and resources are available.  They simply elect not to engage in preventative policies and practices; often choosing profits over people.

140.   The indicia of human trafficking and effective preventative measures are, and at material times prior to Marina Ralph's victimization were, widely known and available to the hospitality industry and hotels, including the Defendant.

141.  Published studies, at material times, reflected that Florida was a top destination for the commercial sexual exploitation of children; that the movement of children for commercial sexual exploitation between Miami and Fort Lauderdale and their surrounding cities was constant and there was pressing need for all entities coming into contact with these children to collaborate to effectively identify and serve these young victims of sexual slavery.

142.  The Defendant was on notice, even prior to the events involving Marina Ralph, that human trafficking of minor girls was an issue for the hospitality industry at large; was prevalent in Broward County, Florida.

143.  The Defendant was responsible for educating and training its employees, including those working at the Extended Stay America Premier Suites in Pompano Beach, as to appropriate human trafficking prevention measures for hotel staff.

justice for kids

Exhibit 1

144. The Defendant was responsible for developing policies and practices for its employees, including those working at Extended Stay America Premier Suites in Pompano Beach, as to appropriate human trafficking prevention measures for hotel staff.

145. The Defendant was responsible for developing and making anti human trafficking resources readily available to its employees, including those at Extended Stay America Premier Suites in Pompano Beach.

146. Understanding the use of hotels to further human trafficking ventures and the prevalence with which it occurs, particularly in Florida, hotels, including the Defendant, were on notice – prior to 2019 – not only of the need to ensure that their premises were safe but that safety measures were incorporated and enhanced to account for those factors unique to human trafficking.

147. The Defendant was keenly aware that reporting observations by its employees could serve as a form of detection and/or prevention of human trafficking ventures.

148. Similarly, the Defendant was keenly aware that failing to report such observations could serve to facilitate human trafficking ventures and jeopardize the safety of those persons on its premises.

### UNREASONABLY DANGEROUS PREMISES

149. The Extended Stay is located at 1401 W. McNab Road in Pompano Beach, Florida.

150. It is at the northwest corner of N. Andrews Avenue and W. McNab Road:

justice for kids

Exhibit 1



151.    The area in which the hotel is located is a high-crime area known for transiency.

152.    It is located in proximity to two highly trafficked thoroughfares:   Andrews
Avenue and McNab Road.

153.    In the roughly 18-months preceding Marina's death, alone, there were over 250
calls for police service to the hotel, including multiple calls for:

> ➤ Missing Persons (recovered/endangered)
> ➤ Overdoses
> ➤ Child Abuse/Neglect
> ➤ Narcotics
> ➤ Domestic Disturbances
> ➤ Assault
> ➤ Breaking/Entering
> ➤ Trespassing

154.    The hotel had actual knowledge of criminal activity occurring on its premises and
of the propensity for criminal activity to be committed on its premises.

155.    The hotel had actual knowledge that criminal activity was being perpetrated by
both registered guests and non-registered visitors, highlighting the need to restrict access,
monitor activity, and account for those people entering and on the premises.

156.    The hotel is designed with multiple points of ingress/egress:

*justice for kids*

Exhibit 1

**South:** the front entrance, through a set of double doors into the lobby.

**East**:   one door leading from the parking lot into the first-floor hallway

one door leading from the parking lot into the stairwell

**West**:   one door leading from the parking lot into the first-floor hallway

one door leading from the parking lot into the stairwell

**North**: one door leading from the parking lot into the first-floor hallway

one door leading from the parking lot into the stairwell

**Pool**:   on the southwest side of the hotel. There is a door leading from the

pool into the first floor.



157.   Except for the pool deck, anyone walking or driving onto the premises can approach the doors on the South, East, West or North side of the hotel unfettered.

158.   The doors on the East, West and North sides of the hotel are designed and intended to be locked at all times, accessible only through the use of a room key.

justice for kids

Exhibit 1

159.    The lobby doors, on the South side, are open until 10:00pm, at which point they lock automatically, and a room key is required for access.

160.    The Defendant designed ingress in this manner out of a clear understanding and recognized that unfettered access to the interior of the hotel presented a serious breach of safety.

161.    Despite intended design, the doors to the East and West stairwells from the parking routinely opened without the use of any key allowing unfettered entrance into the stairwells, and thereby, unfettered access to the hallways on each floor.

162.    Despite recognition of the need to secure all doors, the doors to the East and West first-floor hallways were routinely propped open with rocks allowing for unfettered access to the first-floor hallways and, therefore, the interior of the hotel leading to all interior areas.

163.    The Defendant had actual knowledge about the dangers of the unlocked and persistently propped doors well in advance of Marina's death.

164.    The Defendant had actual knowledge that security was insufficiently staffed well in advance of Marina's death.

165.    The Defendant had actual knowledge that cameras in several interior hallways were either obscured or that visibility through the monitors was dangerously compromised, well in advance of Marina's death.

166.    Despite such knowledge, the Defendant failed to take reasonable, appropriate, and necessary steps to secure the premises.

167.    Hotel operators are, and the Defendant is here, bound to anticipate that its guests are apt to have business and social callers.

168.    The invitation to such callers arises by operation of law out of the relationship between the hotel and its registered guests.

justice for kids

Exhibit 1

169.   A hotel operator must provide reasonably safe premises, including but not limited to reasonably safe ways of ingress and egress, lobbies, hallways, elevators, stairwells, rooms and common usage areas, pursuant to the implied invitation.

170.   As the hotel operator, the Defendant controlled employee training, standardized rules of operation, inspection of the premises and operations at the Extended Stay in Pompano Beach.

171.   The Defendant controlled the mode and manner of the work performed by its employees at the Extended Stay in Pompano Beach.

172.   The Defendant controlled the staffing, hiring and firing for Extended Stay America Premier Suites in Pompano Beach.

173.   The Defendant controlled the engagement of additional, or private, security and further had the obligation to determine the terms of engagement in a manner designed to reasonably ensure safety given all of the circumstances known to the Defendant.

174.   Further, the Defendant had an ongoing obligation to evaluate and re-evaluate the security at the hotel to determine whether the safety of guests, visitors and the public warranted modification, adjustment or enhancement of security measures including, but not limited to: staffing, presence, deterrence, access, ingress and egress, maintenance, repair, visibility, and surveillance monitoring.

### COUNT I

**NEGLIGENCE**
**AGAINST ESA P PORTFOLIO LLC D/B/A EXTENDED STAY AMERICA, INC.**
**FLORIDA'S WRONGFUL DEATH ACT**

175.   Plaintiff re-asserts all allegations contained in the previous paragraphs as if fully set forth herein.

176.   At all material times, the Defendant acted by and through its owners, officers, directors, actual and apparent agents, employees and staff including, but not limited to, its

*justice for kids*

Exhibit 1

managers, housekeeping staff, front desk staff, custodians and maintenance workers who were acting within the course and scope of their employment for the Defendant at Extended Stay America Premier Suites in Pompano Beach.

177.    The Defendant, through its agents and/or employees, owed a non-delegable duty to its invitees, guests and the public, including Marina Ralph, to exercise reasonable and ordinary care to maintain the premises at 1401 W. McNab Road, Pompano Beach, Florida 33069, including the parking lots, hotel access points, hallways, rooms and areas adjacent thereto, in a condition reasonably safe for use by its invitees, guests, and the public.

178.    In particular, the Defendant had a duty to take such precautions as were reasonably necessary to protect its invitees, guests, and the public, including Marina Ralph from harm attendant to criminal conduct that was reasonably foreseeable.

179.    At all material times, the Defendant, through its agents and/or employees, had actual knowledge, or should have known, through the exercise of reasonable care, that hotel was located in and/or adjacent to a high crime area.  Specifically, numerous criminal acts had previously been perpetrated in the area as well as on hotel guests, invitees and the public and it was reasonably likely that such criminal acts would be perpetrated on the Defendant's guests, invitees, and the public unless the Defendant took appropriate measures to provide reasonable security for such individuals.

180.    The Defendant, through its agents and/or employees, knew, or in the exercise of reasonable care should have known, that prior to Marina Ralph's death on or about October 4, 2019, numerous criminal acts including, but not limited to, illicit narcotic transactions, use, overdoses, child abuse, assaults, thefts, missing persons and domestic violence had occurred on the subject premises and throughout adjacent areas.

181.    The Defendant, through its agents and/or employees, knew, or in the exercise of reasonable care should have known, that individuals, particularly minors such as Marina Ralph,

justice for kids

Exhibit 1

could not take the necessary and reasonable measures to provide for their own safety or security while on the subject premises.

182.    In light of the foregoing, at all material times, the acts perpetrated upon Marina Ralph were reasonably foreseeable to the Defendant and the Defendant was in a superior position to appreciate the hazards and take necessary steps to prevent harm to invitees, guests, and the public, including but not limited to Marina Ralph.

183.    At the above-referenced time and place, the Defendant, by and through its agents and/or employees, breached its duty to exercise reasonable care for the safety and protection of invitees, guests, and the public, including the Marina Ralph, and acted in a careless and negligent manner in various respects including through the following acts of omission or commission:

    a.  Failing to provide adequate security for its invitees, guests, and the public, including Marina Ralph;

    b.  Failing to warn its invitees and the public of the nature and character of its premises when it knew or in the exercise of reasonable care should have known that *numerous criminal incidents of a similar nature* to the one herein *(i.e.,* crimes involving narcotics) had occurred on the Defendant's premises and areas adjacent thereto prior to the subject incident;

    c.  Failing to warn, protect, guard, and secure the safety of its invitees, guests, and the public, including Marina Ralph, when the Defendant knew or should have known that the subject premises had a history of similar criminal acts being committed on the property or in the area, thereby creating a dangerous condition to those individuals on the property;

    d.  Failing to police, patrol guard, deter, and otherwise provide adequate protection for its invitees, guests, and the public when the Defendant knew or should have known of foreseeable criminal acts on persons;

    e.  Failing to have and/or maintain surveillance cameras in working condition such that every camera was able to monitor and/or record activity in its line of view;

    f.  Failing to ensure that the monitors provided the visibility that the surveillance cameras were intended to provide;

*justice for kids*

Exhibit 1

g. Failing to monitor surveillance cameras such that persons were able to enter the hotel and get to the rooms without a key;

h. Failing to monitor surveillance cameras such that persons were able to enter the hotel and get to the rooms without detection;

i. Failing to provide proper and sufficient lighting to enable visibility via surveillance cameras;

j. Failing to provide proper and sufficient lighting so as to deter criminal activity on the premises;

k. Failing to hire and/or retain adequate, or a sufficient number of, security personnel to patrol and/or monitor the premises, thereby protecting its invitees, guests, and the public;

l. Failing to create a reasonable security plan so as to deter crime, thereby protecting its invitees, guests, and the public;

m. Failing to employ appropriate and proper security measures protect invitees, guests, and the public;

n. Failing to prepare and/or properly implement adequate security policies, security measures, and security procedures to protect Marina Ralph and other invitees, guests, and members of the public;

o. Failing to ensure that exterior doors were properly functioning, including ensuring that they locked and were only accessible by room key;

p. Failing to repair damage which interfered with the ability of the exterior doors to close and lock properly;

q. Failing to take additional security measures after being placed on notice that locks were not functioning on exterior doors;

r. Failing to take additional security measures after being placed on notice that exterior doors were routinely propped open with rocks or other items;

s. Failing to implement adequate security policies, security measures, and security procedures necessary to protect invitees and the public;

t. Failing to take additional security measures after being put on notice that the security measures in force were inadequate;

u. Failing to adequately provide an overall security plan that would meet the known industry standards and customs for safety in the community;

v. Failing to provide a reasonably safe structural layout of the property upon leasing said property;

*justice for kids*

Exhibit 1

   w. Failing to detect, stop, or identify an unaccompanied minor;

   x. Failing to detect, stop or identify the commercial sexual exploitation of minors occurring on the premises;

   y. Failing to detect, stop, or identify the repeated use of stolen credit cards and identification to pay for room rentals at the premises;

   z. Failing to detect, stop, or identify human trafficking ventures operating at the premises;

  aa. Failing to detect, stop, or identify the sale, purchase and/or use of illegal narcotics on the premises;

  bb. Failing to stop, address, or investigate suspicious activity occurring between and among rooms rented on the premises;

  cc. The preceding paragraphs "a" through "bb", individually and/or as a whole, represent strict deviations from the existing standard of care with regard to security as recognized by similar premises and properties in the local community; and, additional acts of negligence not yet discovered.

184. The Defendant, through its agents and/or employees:

   i. negligently failed to have procedures governing the inspection, supervision, and/or security of the premises, including the exterior doors, stairwells, hallways and rooms where the subject incidents occurred; or alternatively,

  ii. if the Defendant did in fact have procedures governing the inspection, supervision, and security of the premises, it failed to implement said procedures or implemented said procedures in a careless and negligent manner.

185. At all material times, the Defendant, through its agents and/or employees, negligently failed to hire persons, employees, and/or agents reasonably suited for providing, implementing, and maintaining proper security measures to ensure the safety of its invitees and the public.

186.    The Defendant knew or should have known that hotels were utilized by human trafficking ventures to commercially sexually exploit minor children and that such ventures targeted hotels that demonstrated a lax approach to security.

187.    The Defendant knew or should have known that these human trafficking ventures operated by arranging for "Johns" to travel to the location; and, further, that the venture's success depended upon its ability to bring girls and "Johns" in without detection or with as little detection as possible.

188.    The Defendant knew or should have known that unfettered access to the interior of the hotel through exterior doors from a parking lot was particularly attractive to human trafficking ventures.

189.    The Defendant knew or should have known that unfettered access to the interior of the hotel through exterior doors from a parking lot was reasonably likely to lead to the entrance of underage girls and/or "Johns" through the unsecured doors.

190.    The Defendant knew or should have known that human trafficking ventures engaging in the commercial sexual exploitation of minors frequently provide minors with illegal narcotics to facilitate the commercial sexual exploitation.

191.    The Defendant knew or should have known that minors who are exploited by human trafficking ventures are likely to be given narcotics in an isolated environment in which the minor has no genuine ability to help themselves; and, that they are likely to be given narcotics by criminals who are more likely to protect themselves than the minors they are exploiting.

192.    The Defendant's failures, with respect to its duty to maintain the safety and security of the premises as set out above, created an atmosphere devoid of meaningful visible or physical deterrence to prevent criminal activity.  It was an atmosphere in which criminals could, and did, engage in criminal activity without fear of detection, getting caught, or being

justice for kids

Exhibit 1

prosecuted. It was an atmosphere which facilitated the commission of crimes against persons, including minors.   It was the very atmosphere and environment that reasonable security measures are designed to protect against.

193.   The atmosphere created by the Defendant's failures was an unreasonably dangerous condition that the Defendant permitted to exist at its premises.

194.   The Defendant's failures constitute negligence.

195.   The Defendant's negligence directly led to the criminal acts which caused Marina Ralph's injuries and death.

196.   As a direct and proximate result of the Defendant's negligence, the Decedent, Marina Ralph, suffered severe and permanent harms, including but not limited to bodily injury, pain and suffering; mental anguish and emotional distress, including psychological and psychiatric trauma; humiliation; loss of self-esteem, dignity and capacity for enjoyment of life; aggravation of pre-existing conditions; expense of hospitalization and medical care; and death.

197.   The Estate of Marina Ralph has suffered and will continue to suffer damages into the future.

198.   As a result, the Plaintiff, CHARITY PEARROW, as Personal Representative of the Estate of MARINA RALPH seeks to recover those damages which are allowed under the Wrongful Death Act, Fla. Stat. § 768.16 *et seq.,* and include the following:

a) The past and future mental pain and suffering of Charity Pearrow, her natural mother.

b) The past and future loss of Decedent's support and services to Charity Pearrow, her natural mother;

c) Loss of the care, maintenance, support, services, companionship, advice, counsel inheritance and other reasonable contributions of pecuniary and non-pecuniary value that Marina's parents would have otherwise received

*justice for kids*

Exhibit 1

during Marina's life had it not been for her untimely, tragic, and wrongful

death;

d) The expense of funeral arrangements arising from the death of MARINA

RALPH; and

e) Any and all other damages that the applicable laws allow.

WHEREFORE, the Plaintiff, CHARITY PEARROW, as Personal Representative of the

ESTATE OF MARINA RALPH, demands judgment against the Defendant for all permissible

damages exclusive of attorney fees, costs, and interest, in an amount in excess of the

jurisdictional limits of this Court.

### COUNT II

**NEGLIGENCE**
**AGAINST ESA P PORTFOLIO OPERATING LESSEE LLC D/B/A EXTENDED STAY AMERICA, INC.**
**FLORIDA'S WRONGFUL DEATH ACT**

199.    Plaintiff re-asserts all allegations contained in the paragraphs 1-174 as if fully set

forth herein.

200.    At all material times, the Defendant acted by and through its owners, officers,

directors, actual and apparent agents, employees and staff including, but not limited to, its

managers, housekeeping staff, front desk staff, custodians and maintenance workers who were

acting within the course and scope of their employment for the Defendant at Extended Stay

America Premier Suites in Pompano Beach.

201.    The Defendant, through its agents and/or employees, owed a non-delegable duty

to its invitees, guests and the public, including Marina Ralph, to exercise reasonable and ordinary

care to maintain the premises at 1401 W. McNab Road, Pompano Beach, Florida 33069,

including the parking lots, hotel access points, hallways, rooms and areas adjacent thereto, in a

condition reasonably safe for use by its invitees, guests, and the public.

202.   In particular, the Defendant had a duty to take such precautions as were reasonably necessary to protect its invitees, guests, and the public, including Marina Ralph from harm attendant to criminal conduct that was reasonably foreseeable.

203.   At all material times, the Defendant, through its agents and/or employees, had actual knowledge, or should have known, through the exercise of reasonable care, that hotel was located in and/or adjacent to a high crime area.   Specifically, numerous criminal acts had previously been perpetrated in the area as well as on hotel guests, invitees and the public and it was reasonably likely that such criminal acts would be perpetrated on the Defendant's guests, invitees, and the public unless the Defendant took appropriate measures to provide reasonable security for such individuals.

204.   The Defendant, through its agents and/or employees, knew, or in the exercise of reasonable care should have known, that prior to Marina Ralph's death on or about October 4, 2019, numerous criminal acts including, but not limited to, illicit narcotic transactions, use, overdoses, child abuse, assaults, thefts, missing persons and domestic violence had occurred on the subject premises and throughout adjacent areas.

205.   The Defendant, through its agents and/or employees, knew, or in the exercise of reasonable care should have known, that individuals, particularly minors such as Marina Ralph, could not take the necessary and reasonable measures to provide for their own safety or security while on the subject premises.

206.   In light of the foregoing, at all material times, the acts perpetrated upon Marina Ralph were reasonably foreseeable to the Defendant and the Defendant was in a superior position to appreciate the hazards and take necessary steps to prevent harm to invitees, guests, and the public, including but not limited to Marina Ralph.

207.   At the above-referenced time and place, the Defendant, by and through its agents and/or employees, breached its duty to exercise reasonable care for the safety and

justice for kids

Exhibit 1

protection of invitees, guests, and the public, including the Marina Ralph, and acted in a careless and negligent manner in various respects including through the following acts of omission or commission:

    a.   Failing to provide adequate security for its invitees, guests, and the public, including Marina Ralph;

    b.   Failing to warn its invitees and the public of the nature and character of its premises when it knew or in the exercise of reasonable care should have known that *numerous criminal incidents of a similar nature* to the one herein *(i.e.,* crimes involving narcotics) had occurred on the Defendant's premises and areas adjacent thereto prior to the subject incident;

    c.   Failing to warn, protect, guard, and secure the safety of its invitees, guests, and the public, including Marina Ralph, when the Defendant knew or should have known that the subject premises had a history of similar criminal acts being committed on the property or in the area, thereby creating a dangerous condition to those individuals on the property;

    d.   Failing to police, patrol guard, deter, and otherwise provide adequate protection for its invitees, guests, and the public when the Defendant knew or should have known of foreseeable criminal acts on persons;

    e.   Failing to have and/or maintain surveillance cameras in working condition such that every camera was able to monitor and/or record activity in its line of view;

    f.   Failing to ensure that the monitors provided the visibility that the surveillance cameras were intended to provide;

    g.   Failing to monitor surveillance cameras such that persons were able to enter the hotel and get to the rooms without a key;

    h.   Failing to monitor surveillance cameras such that persons were able to enter the hotel and get to the rooms without detection;

    i.   Failing to provide proper and sufficient lighting to enable visibility via surveillance cameras;

j.   Failing to provide proper and sufficient lighting so as to deter criminal activity on the premises;

k.   Failing to hire and/or retain adequate, or a sufficient number of, security personnel to patrol and/or monitor the premises, thereby protecting its invitees, guests, and the public;

l.   Failing to create a reasonable security plan so as to deter crime, thereby protecting its invitees, guests, and the public;

m.  Failing to employ appropriate and proper security measures protect invitees, guests, and the public;

n.   Failing to prepare and/or properly implement adequate security policies, security measures, and security procedures to protect Marina Ralph and other invitees, guests, and members of the public;

o.   Failing to ensure that exterior doors were properly functioning, including ensuring that they locked and were only accessible by room key;

p.   Failing to repair damage which interfered with the ability of the exterior doors to close and lock properly;

q.   Failing to take additional security measures after being placed on notice that locks were not functioning on exterior doors;

r.   Failing to take additional security measures after being placed on notice that exterior doors were routinely propped open with rocks or other items;

s.   Failing to implement adequate security policies, security measures, and security procedures necessary to protect invitees and the public;

t.   Failing to take additional security measures after being put on notice that the security measures in force were inadequate;

u.   Failing to adequately provide an overall security plan that would meet the known industry standards and customs for safety in the community;

v.   Failing to provide a reasonably safe structural layout of the property upon leasing said property;

justice for kids

Exhibit 1

w.  Failing to detect, stop, or identify an unaccompanied minor;

x.  Failing to detect, stop or identify the commercial sexual exploitation of minors occurring on the premises;

y.  Failing to detect, stop, or identify the repeated use of stolen credit cards and identification to pay for room rentals at the premises;

z.  Failing to detect, stop, or identify human trafficking ventures operating at the premises;

aa. Failing to detect, stop, or identify the sale, purchase and/or use of illegal narcotics on the premises;

bb. Failing to stop, address, or investigate suspicious activity occurring between and among rooms rented on the premises;

cc. The preceding paragraphs "a" through "bb", individually and/or as a whole, represent strict deviations from the existing standard of care with regard to security as recognized by similar premises and properties in the local community; and, additional acts of negligence not yet discovered.

208.   The Defendant, through its agents and/or employees:

i.  negligently failed to have procedures governing the inspection, supervision, and/or security of the premises, including the exterior doors, stairwells, hallways and rooms where the subject incidents occurred; or alternatively,

ii.  if the Defendant did in fact have procedures governing the inspection, supervision, and security of the premises, it failed to implement said procedures or implemented said procedures in a careless and negligent manner.

209.   At all material times, the Defendant, through its agents and/or employees, negligently failed to hire persons, employees, and/or agents reasonably suited for providing,

implementing, and maintaining proper security measures to ensure the safety of its invitees and the public.

210. The Defendant knew or should have known that hotels were utilized by human trafficking ventures to commercially sexually exploit minor children and that such ventures targeted hotels that demonstrated a lax approach to security.

211. The Defendant knew or should have known that these human trafficking ventures operated by arranging for "Johns" to travel to the location; and, further, that the venture's success depended upon its ability to bring girls and "Johns" in without detection or with as little detection as possible.

212. The Defendant knew or should have known that unfettered access to the interior of the hotel through exterior doors from a parking lot was particularly attractive to human trafficking ventures.

213. The Defendant knew or should have known that unfettered access to the interior of the hotel through exterior doors from a parking lot was reasonably likely to lead to the entrance of underage girls and/or "Johns" through the unsecured doors.

214. The Defendant knew or should have known that human trafficking ventures engaging in the commercial sexual exploitation of minors frequently provide minors with illegal narcotics to facilitate the commercial sexual exploitation.

215. The Defendant knew or should have known that minors who are exploited by human trafficking ventures are likely to be given narcotics in an isolated environment in which the minor has no genuine ability to help themselves; and, that they are likely to be given narcotics by criminals who are more likely to protect themselves than the minors they are exploiting.

216. The Defendant's failures, with respect to its duty to maintain the safety and security of the premises as set out above, created an atmosphere devoid of meaningful visible

or physical deterrence to prevent criminal activity.  It was an atmosphere in which criminals could, and did, engage in criminal activity without fear of detection, getting caught, or being prosecuted. It was an atmosphere which facilitated the commission of crimes against persons, including minors.  It was the very atmosphere and environment that reasonable security measures are designed to protect against.

217.    The atmosphere created by the Defendant's failures was an unreasonably dangerous condition that the Defendant permitted to exist at its premises.

218.    The Defendant's failures constitute negligence.

219.    The Defendant's negligence directly led to the criminal acts which caused Marina Ralph's injuries and death.

220.    As a direct and proximate result of the Defendant's negligence, the Decedent, Marina Ralph, suffered severe and permanent harms, including but not limited to bodily injury, pain and suffering; mental anguish and emotional distress, including psychological and psychiatric trauma; humiliation; loss of self-esteem, dignity and capacity for enjoyment of life; aggravation of pre-existing conditions; expense of hospitalization and medical care; and death.

221.    The Estate of Marina Ralph has suffered and will continue to suffer damages into the future.

222.    As a result, the Plaintiff, CHARITY PEARROW, as Personal Representative of the Estate of MARINA RALPH seeks to recover those damages which are allowed under the Wrongful Death Act, Fla. Stat. § 768.16 *et seq.,* and include the following:

   a.   The past and future mental pain and suffering of Charity Pearrow, her natural mother.

   b.   The past and future loss of Decedent's support and services to Charity Pearrow, her natural mother;

justice for kids

Exhibit 1

    c.   Loss of the care, maintenance, support, services, companionship, advice, counsel inheritance and other reasonable contributions of pecuniary and non-pecuniary value that Marina's parents would have otherwise received during Marina's life had it not been for her untimely, tragic, and wrongful death;

    d.   The expense of funeral arrangements arising from the death of MARINA RALPH; and

    e.   Any and all other damages that the applicable laws allow.

    WHEREFORE, the Plaintiff, CHARITY PEARROW, as Personal Representative of the ESTATE OF MARINA RALPH, demands judgment against the Defendant for all permissible damages exclusive of attorney fees, costs, and interest, in an amount in excess of the jurisdictional limits of this Court.

## DEMAND FOR JURY TRIAL

    Plaintiff hereby demands trial by jury on all issues triable as of right by a jury.

Dated:  September 30, 2021          Respectfully submitted,

                             JUSTICE FOR KIDS
                             a division of Kelley Kronenberg, P.A.
                             10360 West State Road 84
                             Fort Lauderdale, Florida 33324
                             Telephone:    754.888.5437
                             Facsimile:    954.644.4848

                          By:    *Justin D. Grosz*
                                Justin D. Grosz
                                Fla. Bar No.: 984000
                                justin@justiceforkids.com
                                marisela@justiceforkids.com